# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ILLINOIS
# WESTERN DIVISION

| | |
|---|---|
| Michael Brosman, | ) |
| Plaintiff, | ) |
| v. | ) No. 17 CV 50084 |
| | ) Magistrate Judge Iain D. Johnston |
| Nancy A. Berryhill, Acting Commissioner of Social Security,[1] | ) |
| Defendant. | ) |

## MEMORANDUM OPINION AND ORDER

Plaintiff, who is now 51 years old, worked as a construction laborer for many years but stopped working in 2011 after having heart problems. In 2013, he applied for disability benefits. Although the heart condition is one part of his argument for being found disabled, this appeal focuses only on his mental health conditions. According to his wife, plaintiff has suffered from depression for well over a decade, and also has had a life-long learning disability, reading at a second grade level. These problems have worsened over time, with plaintiff having depressive episodes (where he doesn't come out of his room for days), anxiety, crying spells, fear of needles (preventing him from taking insulin for his diabetes), anger outbursts (he punched holes in his house and smashed his cell phone), paranoia, and memory loss. Plaintiff's wife has described the burden of living with, worrying about, and managing plaintiff's unpredictable moods as being like constantly walking on eggshells.

Before applying for disability benefits, plaintiff received some treatment, although it is unclear just how much or what it involved. In the early 2000s, he was prescribed Prozac, which was periodically increased thereafter, and he was given a diagnostic assessment by Aspen

---

[1] Nancy A. Berryhill has been substituted for Carolyn W. Colvin. Fed. R. Civ. P. 25(d).

1

Counseling in 2011 and apparently participated in some individual and family counseling at that time.[2] The relevant treatment for this appeal occurred after he applied for benefits. In March 2014, plaintiff saw Dr. Jafry, a psychiatrist, and Charles Dudley, a therapist. There was a gap in this treatment of about nine months from July 2014 until April 2015. In June 2015, Dr. Jafry completed a two-page medical form, opining that plaintiff's mental problems were severe.

Dr. Jafry's opinion, along with Mr. Dudley's therapy notes, were two important sources of evidence that plaintiff relied on. But perhaps the most compelling evidence, at least from an emotional standpoint, came from family members. Plaintiff's wife and two of his daughter provided written statements describing the emotional and practical difficulties of living with plaintiff.

Plaintiff's wife's statement was the most detailed (four pages, single-line spaced). Ex. 15E. She described the burden of having to work to support the family because plaintiff wasn't working, having to care for one of her daughters who was staying for an extended period at Northwestern Hospital while getting treatment for leukemia (the hospital was two hours from their home), and having to take care of her two other daughters at home. In addition, she had to constantly monitor plaintiff who "cannot function with stress, disappointment, anger, sadness, everyday emotions that we all deal with." Early in their 25-year marriage, plaintiff would have what the wife described as "crashes," which were depressive episodes where plaintiff would stay in bed for several days straight, but they occurred only once every six months. Over time, however, the crashes became more severe and more frequent. Plaintiff "seemed to have a switch or trigger and could go from happy to irate within a split second." He would get angry and scream about small family arguments and would then lock himself in his bedroom for days.

---

[2] These facts are taken from the psychological consultative examiner's report and appear to be based on the wife's recollections.

These types of "bizarre" incidents happened "all of the time." In the last five years, she has had "to leave work 6 times for fear that [plaintiff] had killed himself." Because of plaintiff's unpredictable moods, his wife spent her work breaks and lunches calling him to "gauge his mood and behavior" so that she could try and "diffuse" lurking problems. She described it as "babysitting from the office." She stated that plaintiff would get very anxious about medical procedures. After the heart stent procedure, the next day plaintiff "forcibly releas[ed] himself from the hospital" in a fit of anger and "walked five miles" without telling anyone. Plaintiff is given anti-anxiety medication before any medical procedures. She described their family life as a "constant fragile situation." At one point, she considered divorcing plaintiff because things were so bad, but her father told her that marriage is for "better or worse" and she decided to stay in the marriage. If she ever divorced plaintiff, she believes he would "be dead in less than two months" because he could not take care of himself. Plaintiff's anger outbursts have led to him smashing his cellphone with a hammer, destroying the remote control by throwing it at the wall simply because a doorbell rang, and intentionally driving the family car into a five-foot deep snowbank for no reason. She stated that plaintiff's recent work with Dr. Jafry and therapist Charles Dudley had been a great help and provided her some relief. She had considered "committing [plaintiff] when things have gotten bad," but knew he would just check himself out. Her four-page statement was based on a journal that she had been keeping for the last year.

Plaintiff's daughters described similar frustrations. One daughter stated that plaintiff is "not capable of being an adult or putting others first" and is "like a small child that needs attention and can never be left unattended." R. 277. Another daughter described the following incidents:

> At the beginning of all of this I actually didn't know what it was at first until I got a little older which might have been in 5th grade. I remember all the breakouts that

3

> I've seen or heard! He's done a lot: Punching a wall, throwing a hammer in the wall, throwing his phone out of the window (and then Bethany and I having to go find it in the dark), getting his car stuck in the snow on purpose and much more. While these were the first that came to mind [there] are many more that I can name.

R. 275. She stated that her father would lock himself in his room for days or even weeks at a time, and that she had to watch over her younger sister. Because of her father's unpredictable moods and behavior, she "started getting anxiety and emotionally scared." *Id.* She concluded her statement as follows: "I know that you guys won't know what we experience unless you were in our place but I wouldn't want to give this misery to someone else because this [is] one of the worst things that someone can live through." *Id.*

To summarize, plaintiff's case rested primarily on these three evidentiary sources—Dr. Jafry's opinion, Mr. Dudley's notes, and the three family statements. Plaintiff believes that they painted a consistent and reinforcing picture of a man with debilitating mental health conditions.

The ALJ disagreed. The ALJ basically concluded that plaintiff's problems were mild and that they were addressed relatively easily after a few doctor visits. The ALJ rejected Dr. Jafry's opinion and the family statements, supposedly because they were inconsistent with other evidence. The ALJ concluded that Mr. Dudley had opined that plaintiff was able to work fulltime. Plaintiff argues that the ALJ's reasoning was flawed or incomplete. This Court agrees.

**Therapist Charles Dudley.** The Court begins with the most clear-cut error. Plaintiff believes that Mr. Dudley's treatment notes support both his general claim, as well as Dr. Jafry's opinion. However, the ALJ reached the opposite conclusion. The ALJ did so by relying on one statement found in Mr. Dudley's treatment notes. It is the following: "[Plaintiff] does appear that he would be able to be gainfully employed." R. 21, 466. When read in isolation, this one statement appears to support the ALJ's conclusion. However, as plaintiff persuasively argues, this statement "was clearly a typographical error." Dkt. #7 at 8. Mr. Dudley, according to

4

plaintiff, inadvertently omitted the word "not" from this statement, meaning that Mr. Dudley believed that plaintiff was *not* capable of working. If true, this would mean that Mr. Dudley's opinion was consistent with, and supportive of, Dr. Jafry's opinion.

As support for the typo argument, plaintiff asserts that this is the only logical conclusion based on the paragraph from which the statement was taken.[3] In addition, plaintiff argues that all of Mr. Dudley's other treatment notes consistently support the opposite conclusion. As plaintiff notes, the ALJ ignored all these other statements and simply glommed onto this one statement. The Court finds these arguments persuasive. The Government also implicitly agrees. In its response brief, the Government has not disputed plaintiff's claim that this was a meaning-altering typo. The Government's only response is to argue that the ALJ did not rely on this statement. But if so, why even mention it? That point aside, the Government is incorrect. Although the ALJ did include two caveats—that Mr. Dudley did not provide a "function-by-function assessment" and that his opinion dealt "with an issue reserved for the Commissioner"— the ALJ "nevertheless" concluded that Mr. Dudley's statement provided "additional evidence that is inconsistent with Dr. Jafry's opinion." R. 21. To sharpen the point, this one erroneous statement was a key piece of evidence (perhaps the only concrete piece of evidence) used to characterize Dr. Jafry's opinion as an outlier. It also may have been used, in domino-like fashion, to discredit the family statements. For these reasons, this error was significant and, by itself, is a basis for a remand. *See Pierce v. Colvin*, 739 F.3d 1046, 1050 (7th Cir. 2014) (remanding

---

[3] The full paragraph states as follows: "Patient seen for follow up session. He was with his wife. The wife feels that his problems are chronic. Over [the] last 15 years he struggled with work and performing his duties. He had worked various jobs but would become depressed and had to miss work for weeks. He still struggles with cognitive skills. Wife states that he was a poor student and had learning disabilities. He worries about not being able to return to work. *He does appear that he would be able to be gainfully employed.* He is waiting to hear from his SSDI appeal. He and wife think he will get denied the second time as well. Continue IPT and supportive therapy. RTC 2 weeks." R. 466 (emphasis added).

because the ALJ "misstated some important evidence and misunderstood the import of other evidence").

**Family Statements.** The ALJ gave the three family statements only limited weight based on the following analysis:

> Additionally, the claimant's wife and two of his daughters submitted statements describing his symptoms and their observations (Ex 13E-15E). Social Security Ruling 06-03p provides that opinions by acceptable as well as non-acceptable medical sources and by any other third party must be weighed and evaluated in accordance with the criteria set forth in 20 CFR 404.1527. The opinions of the claimant's wife and daughters have been weighed and considered accordingly. However, more than limited weight cannot be given to these statements because they, like the claimant's, are not consistent with the preponderance of opinions and observations by medical doctors in this case. Incidentally, none of these statements were dated or signed. Regardless, even if they were, they are not consistent with the claimant's lack of consistent treatment for his conditions, particularly his mental health issues that are the focus of the statements.

R. 22-23. This explanation is conclusory and insufficient in several respects.

First, the ALJ did not even summarize the statements at all. As noted above, these statements are detailed, cover a wide timespan, set forth concrete examples, and describe plaintiff's various issues. Having considered many family statements in disability cases, the Court finds that the wife's statement stands out in terms of the level of detail provided.

Second, the wife's statement was particularly important given plaintiff's memory problems and the wife's role as the caretaker of his daily life and medical treatment. Plaintiff's wife not was able to attend the hearing because she had to help her daughter who was in the hospital receiving leukemia treatment. At the hearing, plaintiff was unable to answer basic questions about his medications and other issues. Dr. Kucera, the psychological consultative examiner who had earlier interviewed plaintiff and his wife, believed that the wife was an "adequate historian" of plaintiff's condition; whereas, plaintiff was only a "poor historian." R. 441. In reading the hearing transcript, there are a number of places where plaintiff struggled to

recall relevant facts, had trouble remembering words, and gave inconsistent or puzzling answers. For example, in the following colloquy, he gave two seemingly divergent answers to the same question:

> Q  Okay, so even though you're taking these medications, do you still feel like you have some depression symptoms?
>
> A  Once in a [while], yes.
>
> Q  So, how often would you say once in a while is?
>
> A  Maybe 20 days out of the month.

R. 50.

Third, the only concrete criticism the ALJ made about the family statements was that they were not signed or dated. But the mere fact the ALJ even mentioned this point, albeit under the rhetorical cover that it was only an "incidental" observation, shows the weakness of the ALJ's analysis. Did the ALJ have any credible basis for believing that these statements were not genuine or timely? The wife's statement refers to the daughter's September 4, 2015 diagnosis of leukemia, which establishes that it had to be written within a month of the hearing.

Fourth, the ALJ's other explanation for disregarding these statements was that they were supposedly inconsistent with plaintiff's "lack of consistent treatment." This is a valid avenue to consider, both with respect to the family statements and more broadly. But the ALJ did not fully explore this issue. For one thing, the ALJ did not acknowledge that plaintiff had received some treatment earlier in his life and had been taking Prozac for years. Another problem is that the ALJ did not consider possible mitigating explanations. *See Pierce v. Colvin*, 739 F.3d 1046, 1050 (7th Cir. 2014). The statement from plaintiff's wife suggests that he may have resisted treatment due to his psychological problems and also that there may have been practical difficulties in getting him to treatment given the wife's work and other duties. It is also not

7

known whether there were financial difficulties in getting treatment. These factors should be explored on remand.

**Dr. Jafry's opinion.** Plaintiff argues that the ALJ failed to provide an adequate explanation for rejecting a treating physician's opinion. Before considering the ALJ's rationales for doing so, the Court will first summarize Dr. Jafry's opinion. Ex. 19F. She diagnosed plaintiff with the following:

> Major depression; recurrent, significant learning disabilities, poor self-efficacy, emotionally labile, sleep disturbances, anhedonia, mood variations, diurnal mood swings, low frustration tolerance, temperament control problems, interpersonal conflict, learning disabilities, multiple physical problems, elevated blood pressure, hyperlipidemia, concentration orthostatic hypertension, cardiac problems, diabetic, social deficits.

She assessed plaintiff's limitations in activities of daily living as "marked"; his limitations in social functioning as "extreme" and his limitations in maintaining concentration, persistence, or pace as "extreme." She also rated plaintiff in seven specific job function categories, finding that he was "Not able to perform" four of the seven functions, and was "Seriously limited" in the other three. She estimated that plaintiff would miss five or more days a month (the highest category offered) and would be off-task 30% or more in a normal workday (also the highest category). Overall, Dr. Jafry's opinion was an unequivocal statement. In this Court's experience, doctors rarely rate a claimant's Paragraph B limitations as being "extreme."

The ALJ articulated three rationales for rejecting this opinion: (i) plaintiff had a nine-month treatment gap after the first visit with Dr. Jafry; (ii) Dr. Jafry's opinion was inconsistent with Mr. Dudley's statement; and (iii) Dr. Jafry's opinion was inconsistent with her treatment notes. The first two rationales have already been found to be erroneous or incomplete. Here, the Court will consider the third rationale.

8

The ALJ basically believed that Dr. Jafry's underlying examination findings demonstrated that plaintiff's problems were mild or alternatively that they improved after starting treatment. *See, e.g.* R. 21 (ALJ noting that Dr. Jafry found that plaintiff "displayed average focus and concentration and his attention was good" during one visit); *id.* (ALJ noting that plaintiff reported that he "felt better" at another visit). It is worth noting that the ALJ's portrayal is starkly at odds with that of the family members, Dr. Jafry, and the consultative examiner. The Court finds that the ALJ's analysis is problematic for two reasons.

First, as plaintiff argues, the ALJ engaged in some cherrypicking by focusing mostly on the normal findings and ignoring some, albeit not all, of the contrary findings. Plaintiff described certain of these contrary findings. *See, e.g.*, R. 527 ("tense, sweaty, irritable, edgy"; "constricted affect"; "stay in bedroom, isolate, lack of motivation, crying spell, feel hopeless"). Second, the ALJ engaged in doctor playing. The ALJ did not call a medical expert at the hearing, and the opinions from the State agency physicians were rendered before Dr. Jafry issued his opinion. These doctors, therefore, offered no assessment of Dr. Jafry's opinion. As a result, the ALJ's analysis necessarily relied on her layperson intuitions about the meaning and significance of Dr. Jafry's examination findings. *See Lambert v. Berryhill*, No. 17-1627 at p. 8 (7th Cir. July 19, 2018) ("ALJs must rely on expert opinions instead of determining the significance of particular medical findings themselves."). This is another ground for a remand.

Viewed from a broader perspective, the ALJ's analysis was incomplete. Rather than viewing the evidence holistically, the ALJ engaged in a divide-and-conquer strategy in which evidence favorable to plaintiff was cubbyholed and brushed aside with a quick analysis. To cite one example, Dr. Kucera, the consultative examiner, found that plaintiff had early onset dementia. The ALJ dismissed this diagnoses quickly, noting that it was not confirmed by another

9

doctor. While true, there was no contrary opinion either. Moreover, the ALJ failed consider that a diagnosis of dementia suggested that Dr. Kucera believed that plaintiff's problems were significant. Additionally, at a more fine-grained level, the ALJ did not acknowledge that Dr. Kucera administered memory and other tests, and concluded that plaintiff had memory and word finding problems.[4] The issue of memory loss was not addressed even though there was other evidence that potentially dovetailed with Dr. Kucera's observations. Plaintiff's wife raised this issue with Mr. Dudley. R. 504. At the hearing, plaintiff stated that his memory problems caused him difficulties. *See* R. 43 (stating that he "can't remember things," a problem that worsened after the heart surgery). Reading the hearing transcript, the Court notes that there were instances where plaintiff trouble had recalling events or words. *See, e.g.* R. 50 (when asked why he was taking Gabapentin, he stated: "To be honest with you, I'm not sure. I'm sorry."); R. 51 ("I can't even think of this word"—a response given when trying describe Mr. Dudley's job). Although perhaps related more to his learning disability, plaintiff stated that he did not know how to use an ATM machine or how to turn off his cell phone or how to send an email with his phone. Also, Dr. Jafry, contrary to the ALJ's suggestion, did not rate plaintiff's memory as being good. In his opinion, Dr. Jafry ranked plaintiff as "Not able to perform" (the worst possible category offered) in the "ability to remember work-like procedures" and "Seriously limited, but not precluded" (the second worst category) in the "ability to understand, remember, and carryout short and

---

[4] Specifically she found that plaintiff showed "word finding difficulty" in which he would "often use the wrong word that was similar to the correct word"; that he would describe the word he "was trying to use rather than being able to use the word"; that he had a "reported inability to remember important dates such as his children's or wife's birthdays and his wedding anniversary"; that his wife "answered most of the background questions and he appeared unable to do so"; that his "abstract thinking ability appears to be impaired"; that he "did not appear to be responding to internal stimuli"; and that his "affect was blunted." R. 443. He performed below average in memory tests, although not all of them. When asked to count backward by sevens, he responded "100, 92, 85, 64, 56, 47." When asked to name five large cities, he stated "New York, Illinois, California, Florida, and that is all I know." When asked to name five famous living people, he stated "Kid Rock, that is all I can think of." The mental status examination, according to Dr. Kucera, showed "significant deficits" in functioning. It should be noted that Dr. Kucera described the dementia as "early onset." It is not known whether Dr. Kucera had any specific training or experience with dementia issues.

10

simple instructions." R. 665. In sum, whether or not plaintiff had dementia, there is some evidence that he had memory problems. This is an issue, like several others, that should be acknowledged and addressed more fully.

To some extent, every disability case requires that an effort be made to see if the jigsaw pieces will fit together, as there is inevitably some mismatch in the terminology used by doctors, some variance in the diagnostic labels used by medical specialists, or some disagreement on how severe the symptoms are or which ones are more significant. Here, rather than considering whether these variances were truly significant, the ALJ too quickly short-circuited any deeper analysis after finding an initial discrepancy. On remand, the ALJ should call a medical expert to assist in this effort and to provide a broader perspective.

## CONCLUSION

For the foregoing reasons, plaintiff's motion for summary judgment is granted, the government's motion is denied, and this case is remanded for further consideration.

Date: August 6, 2018　　　　　　　　　　By:　_____
　　　　　　　　　　　　　　　　　　　　　　Iain D. Johnston
　　　　　　　　　　　　　　　　　　　　　　United States Magistrate Judge